******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* VERNON HAYNES
## (SC 20794)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

Convicted of murder in connection with the stabbing death of the victim, the defendant appealed to this court. The trial court had precluded the state from using, in its case-in-chief, a statement given by the defendant to the police on the ground that, although the defendant had given the statement voluntarily, it had been obtained in violation of his right to counsel under *Miranda* v. *Arizona* (384 U.S. 436) and *Edwards* v. *Arizona* (451 U.S. 477). The court nevertheless permitted the state to use the statement to impeach the defendant's trial testimony in accordance with *State* v. *Reid* (193 Conn. 646), in which this court, relying on the United States Supreme Court's decision in *Harris* v. *New York* (401 U.S. 222), held that the Connecticut constitution permits the state to impeach a criminal defendant's trial testimony with a voluntary statement that was obtained in violation of *Miranda*. On appeal, the defendant claimed, inter alia, that this court should overrule *Reid* and conclude that article first, § 8, of the Connecticut constitution precluded the state from using his statement to impeach his trial testimony. *Held*:

Guided by the relevant factors set forth in *State* v. *Geisler* (222 Conn. 672) for construing the Connecticut constitution, as well as stare decisis considerations, this court declined the defendant's request to overrule *Reid* and concluded that the state's use of the defendant's statement for impeachment purposes did not violate the state constitution.

The defendant did not provide inescapable reasons that would compel this court to overrule *Reid*, insofar as the overwhelming weight of authority from other states aligned with Connecticut's existing view of the *Harris* impeachment exception, the defendant failed to establish that the rights of criminal defendants are not adequately protected by the policy articulated in *Harris* and *Reid*, which balances the valuable aid that the impeachment process affords the jury in assessing a defendant's credibility with the deterrent effect on proscribed police conduct that results when a defendant's statement to the police is made unavailable to the prosecution in its case-in-chief, and extending the rule of *Harris* and *Reid* to impeachment evidence would impair the truth seeking process of a criminal trial.

The trial court did not violate the defendant's constitutional rights by admitting certain photographs that the police had taken of the defendant at the time they interrogated him, as the photographs had an independent source in the standard police procedure of photographing arrestees and

were obtained for reasons unrelated to unlawful police conduct, and, accordingly, the photographs were not fruits of the unlawfully obtained statement by the defendant.

The trial court did not abuse its discretion in allowing the prosecution to present the testimony of a witness who had been disclosed only three days prior to the start of evidence, as the record established that the prosecutor did not believe that he needed the witness' testimony when his initial witness list was prepared, the defendant did not demonstrate any prejudice from the delayed disclosure, and the relevant rule of practice (§ 40-13 (c)) embraces a presumption against precluding a witness' testimony as a sanction for delayed disclosure when the party calling the witness did not in good faith intend to call the witness at the time the party provided its initial witness list.

(*One justice concurring in part and dissenting in part*)

Argued November 6, 2024—officially released July 1, 2025

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Schuman, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*John Cizik*, senior assistant public defender, with whom was *Laila M. G. Haswell*, senior assistant public defender, for the appellant (defendant).

*Laurie N. Feldman*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, *Don E. Therkildsen, Jr.*, senior assistant state's attorney, and *Alexandra Arroyo*, assistant state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. Following a jury trial, the defendant, Vernon Haynes, was convicted of murder in violation of General Statutes § 53a-54a in connection with the stabbing death of his girlfriend, T.[1] On appeal, the defen-

---

[1] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

dant makes three claims. First, the defendant asks us to overrule *State* v. *Reid*, 193 Conn. 646, 654–55 and n.11, 480 A.2d 463 (1984), which held that the Connecticut constitution permits the state to impeach a criminal defendant with a voluntary statement obtained in violation of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Second, the defendant claims that the trial court erred in admitting photographs taken of him during an interview that violated his right to counsel under *Miranda*. Third, the defendant claims that he was deprived of a fair trial when the prosecutor presented testimony from a witness who had been disclosed only three days prior to the start of evidence. We disagree with each of the defendant's claims and affirm the judgment of conviction.

The jury could have reasonably found the following facts. The defendant and the victim were in a romantic relationship and lived together in an apartment in Waterbury with the victim's son, W. On May 12, 2018, while in the victim's bedroom, the defendant stabbed her repeatedly in the neck, shoulders, and chest with scissors, causing her death.[2] After killing the victim, the defendant showered, took the victim's wallet, and drove off in her silver Mitsubishi.

W was at home during the murder, playing video games and listening to music in his room while wearing headphones. Later that day, he discovered bloody towels and a bloody pair of shorts, which he had seen the defendant wearing earlier that day, in the bathroom.

---

[2] The state's chief medical examiner determined that the cause of the victim's death was "[s]harp injuries of the head, trunk, and neck, with injury of major blood vessels, larynx, and lung," and that the manner of death was homicide. His autopsy report documented the presence of twenty-seven distinct stab wounds, but he testified at trial that the total was "probably close to double that number," due to the overlapping nature of the injuries. Additionally, the victim's nose was broken, she had bruising on her cheek, jaw, and forehead, and a "subarachnoid hemorrhage of her brain, which is an indication of blunt force going through her brain . . . ."

He then entered the victim's bedroom, where he found the victim lying face down on the bed in a puddle of blood, with her neck sliced open and stab wounds covering her neck, shoulders, and upper back. W called 911 at 3:05 p.m., sobbing: "My mother is dead. . . . She was stabbed to death. . . . The man who was here is gone. . . . There's blood everywhere . . . . She's gone. . . . I know exactly who did it. . . . It was her boyfriend. . . . He's got my mother's car. . . . His phone is off. . . . I don't know where he went." W also called his brother, M.

The police and paramedics arrived several minutes later, pronounced the victim dead, and documented the crime scene. Police officers interviewed W, M, and a neighbor, James Cooper, who had heard screaming coming from the victim's apartment and had later seen the defendant getting into the victim's car and driving away. At trial, Cooper testified that he had heard the victim screaming and yelling, "get the fuck out. Leave me alone. Get the fuck off me."

After identifying the defendant as a suspect and applying for an arrest warrant, the Waterbury police broadcast a description of the victim's Mitsubishi and license plate number over the police radio system. Because the defendant had connections in New York, the police also alerted law enforcement agencies there of the murder. Family members of the victim, including M and the victim's sister-in-law, K, attempted to reach the defendant through Facebook Messenger, asking him for his location and to turn himself in to the police.

The defendant responded to the messages sent by both M and K. To M, he wrote that "he had no option" but to kill the victim, that it was "self-defense" and "an accident," and that he "couldn't control" his actions. He told M that he was on his way to Massachusetts in a van and, from there, would go to Mexico to kill himself.

To K, he wrote: "I'm almost [out of] the country. . . . [S]he kept attacking me . . . . She went crazy because I would not buy crack for her. She smashed me in the face with a glass football. I did nothing. She stabbed my eardrum with a long pointy comb. I did nothing. She beat on my face with her [fist]. I did nothing but . . . keep ok pushing her away. She took her key and . . . turned it into my spine. I pushed her. She yanked my locks out. I did nothing. . . . I'm fucked up face swollen spine hurting. I can [barely] stand."[3]

Notwithstanding his statements to M and K, the defendant had, in fact, driven to the Bronx, New York, where license plate readers had detected the victim's Mitsubishi, and the Waterbury police had traced his cell phone. Around midnight, Waterbury police detectives provided the defendant's general location to the New York City Police Department, which dispatched officers to arrest him. While being transported to a police station in the Bronx, and unprompted by any questioning from New York City police officers, the defendant began to speak, stating: "You can record everything I say." The defendant explained: "She attacked me because I would not buy her crack. . . . She took the back of a comb, stuck it in my ear. I laid down. She took a ceramic football, smashed me in the face. . . . I pushed her and told her [to] behave herself. She took the scissors [and] put it in her hand. She yanked my hair out of my head. I laughed at her." He continued: "I tried leaving. She . . . stuck [a key] into me and started turning, and I pushed her onto the bed. Then I went into the kitchen to fix myself something to eat. . . . She attacked me with . . . scissors. Then, I blacked out. . . . I wanted you all to kill me. . . . That's how bad my day went. I did nothing to her. . . . What was I supposed to do . . . sit there and let her hurt me? I tried walking out

---

[3] This court added punctuation to this text message for purposes of clarity.

the door, and she kept grabbing and pulling, and pushing on me. . . . Shit happens. I did not plan this.''

Meanwhile, Waterbury police detectives traveled to the Bronx to interview the defendant. When they arrived at the police station, they spoke with the defendant, who, over the course of an approximately one hour interview, confessed to killing the victim. During that interview, the detectives took a number of photographs of the defendant, including close-ups of his forehead, arms, ear, and finger. Waterbury police officers also searched the Mitsubishi, in which they found bloody towels and the victim's identification and wallet.

The state charged the defendant with murder. He pleaded not guilty and elected a jury trial, during which he testified in his own defense and raised the affirmative defense of extreme emotional disturbance. The jury returned a verdict of guilty, and the trial court rendered judgment in accordance with the jury's verdict and sentenced the defendant to a term of fifty-two years of imprisonment. This direct appeal followed. See General Statutes § 51-199 (b) (3).

I

The defendant first claims that article first, § 8, of the Connecticut constitution[4] precluded the state from using his confession, which the Waterbury police had obtained in violation of *Miranda* and *Edwards* v. *Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), to impeach his trial testimony. We disagree.

The record reveals the following additional relevant facts and procedural history. On the night of the defendant's arrest, Kyle Howles, a Waterbury police detective, provided the defendant with *Miranda* warnings

---

[4] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

while he was in custody at the Bronx police station. When asked if he wished to waive his rights and to speak with Howles, the defendant said that he needed an attorney. In response, Howles stated: "I can't ask you any more questions. . . . I know you probably have some explanation. You kinda already started to give me an explanation. I can't talk to you without your lawyer present." The defendant then stated that he wanted to talk, without a lawyer present, three different times. The defendant then gave a detailed statement to the Waterbury police about the altercation buring which he had killed the victim.

The defendant moved to suppress the statement he gave to the Waterbury police. After a suppression hearing, the trial court granted the motion in part and ordered the prosecution not to use the statement in its case-in-chief. The court found that (1) the defendant had unequivocally invoked his *Miranda* right to counsel, triggering "the bright-line rule" under *Edwards* that "all interrogation must cease and can only restart if the defendant initiates conversation," and (2) the defendant did not reinitiate the conversation, but, instead, Howles' statement referring to the defendant's probable "explanation" caused the defendant to continue speaking. The trial court found Howles' statement to be the "functional equivalent of an interrogation" but also observed that it was not "intentionally designed to circumvent the defendant's rights."

In accordance with the trial court's ruling, the prosecution did not rely on the defendant's statement to the Waterbury police when presenting its case-in-chief. Additionally, the defendant filed a motion in limine to preclude the state from impeaching him with the suppressed statement. The trial court denied the defendant's motion, relying on this court's decision in *Reid*. See *State* v. *Reid*, supra, 193 Conn. 655 and n.11.

The defendant testified in support of his affirmative defense of extreme emotional disturbance. During direct examination, the defendant told the jury about his religion, Rastafarianism, and how his dreadlocks are a "natural baptism" that represent his vow of dedication to God. After explaining that his altercation with the victim began when he refused to buy crack cocaine for her, he testified that he "[p]hysically" went "to another emotional state" and hit and stabbed the victim after she "jammed" a comb into his ear and pulled hair from his head. According to the defendant, when the victim "yanked" his dreadlocks, he lost control of himself. The defendant further testified that he did not remember everything he did because he blacked out.

During cross-examination, the prosecutor explored a variety of inconsistencies between the defendant's trial testimony and his statement to the Waterbury police. These inconsistencies included subjects such as his position and location when the altercation with the victim began, whether he was clothed or naked during the altercation, and when his blackout state started and ended. The prosecutor then explored these various points in detail and used multiple sources to call the defendant's testimony into question, such as the Facebook messages with M and K, photographs of the victim's injuries that had already been entered into evidence, and the testimony of Cooper.

During closing argument, the prosecutor highlighted the inconsistencies between the defendant's trial testimony and his statements to the police, and asked the jury to use the statement the defendant made to the Waterbury police in New York only to judge his credibility. In its jury instructions, the trial court also reminded the jury of the limited purpose of this evidence.

On appeal, the defendant claims that, under article first, § 8, of the Connecticut constitution, the state

should not have been permitted to impeach his trial testimony with the statement he made to the Waterbury police after he invoked his *Miranda* right to counsel. He asks us to overrule *Reid*, which followed the United States Supreme Court's decision in *Harris* v. *New York*, 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971), and held, as a matter of state constitutional law, that prior inconsistent statements obtained in violation of *Miranda* may be used to impeach a defendant's trial testimony. *State* v. *Reid*, supra, 193 Conn. 655; see also id., 655 n.11 ("Although [this court has] interpreted article first, § 8 . . . to provide greater guarantees than its federal counterpart . . . we decline to do so in this instance. We find the reasoning in *Harris* . . . persuasive and adhere to that decision." (Citation omitted.)). The defendant argues that *Reid* was wrongly decided because this court did not conduct "a full analysis of the independent constitutional claim but simply adopted the rationale of *Harris* in a conclusory footnote." In support of his contention that the Connecticut constitution provides greater protection than the federal constitution, the defendant's analysis under *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), focuses on the historical insights, case law from other states, and public policy factors. We are not persuaded that *Reid* was wrongly decided and conclude that the state's use of the defendant's otherwise voluntary statement for impeachment purposes did not violate the Connecticut constitution.

The defendant correctly observes that *Reid*'s analysis of this issue lacked the benefit of full briefing or analysis of the issue based on the now familiar factors articulated in *Geisler*, which was decided approximately eight years after *Reid*. This court's decision in *Geisler*, however, did not purport to do anything more than collect from our prior state constitutional precedent certain "tools of analysis [that] should be considered to the

extent applicable"; id., 685; because they were useful in construing the "contours of our state constitution and [in] reach[ing] reasoned and principled results . . . ." Id., 684. Although *Geisler* provides us with a framework for "a more robust consideration" of the state constitutional claim in the present case; *State* v. *Langston*, 346 Conn. 605, 625, 294 A.3d 1002 (2023), cert. denied, U.S. , 144 S. Ct. 698, 217 L. Ed. 2d 391 (2024); the advent of the *Geisler* analysis does not by itself diminish the precedential value of *Reid* as a matter of state constitutional law.[5] See, e.g., *State* v. *Williams*, 311 Conn. 626, 632–33, 88 A.3d 534 (2014); *State* v. *James*, 237 Conn. 390, 413–14, 678 A.2d 1338 (1996).

Thus, our *Geisler* analysis is informed by the doctrine of stare decisis, which "counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 170, 920 A.2d 236 (2007). Stare decisis principles require a "clear showing that an established rule is incorrect and harmful before it is abandoned . . . ." (Internal quotation marks omitted.) *State* v. *McElveen*, 261 Conn. 198, 212, 802 A.2d 74 (2002). A claimant must demonstrate not merely the preferability of a different rule but provide reasons that are so " 'inescapable' " as to compel this court to overrule precedent. *State* v. *Henderson*, 348 Conn. 648, 657, 309 A.3d 1208 (2024).

In considering the continuing vitality of *Reid*, we begin with the well settled proposition that "the federal constitution sets the floor, not the ceiling, on individual rights." *State* v. *Purcell*, 331 Conn. 318, 341, 203 A.3d 542 (2019). "In construing the Connecticut constitution to determine whether it provides our citizens with

---

[5] The release of *Geisler* in 1992 did not mark the beginning of our state constitutional jurisprudence. See generally *State* v. *Marsala*, 216 Conn. 150, 579 A.2d 58 (1990); *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 469 A.2d 1201 (1984); *Horton* v. *Meskill*, 172 Conn. 615, 376 A.2d 359 (1977).

greater protections than the federal constitution, we employ a multifactor approach that we first adopted in [*Geisler*]. The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms [otherwise described as public policies]."[6] (Internal quotation marks omitted.) *State* v. *Griffin*, 339 Conn. 631, 691, 262 A.3d 44 (2021), cert. denied,     U.S.    , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022).

"The *Geisler* factors serve a dual purpose: they encourage the raising of state constitutional issues in a manner to which the opposing party . . . can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in *Geisler* we compart-

---

[6] The state argues that a *Geisler* analysis is reserved for questions of state constitutional interpretation and is not applicable to prophylactic rules that protect established constitutional rights. It cites *State* v. *Purcell*, supra, 331 Conn. 318, in which this court suggested as much and offered the possibility that a "policy centered weighing process" may be more appropriate than a *Geisler* analysis. Id., 343 n.16. We also noted in *Purcell* that this court had previously considered the *Geisler* factors when deciding whether to adopt a prophylactic rule under the state constitution. Id.; see, e.g., *State* v. *Harris*, 330 Conn. 91, 115, 131, 191 A.3d 119 (2018) (federally established framework for eyewitness identification inadequately protects defendants' due process rights under state constitution); *State* v. *Jenkins*, 298 Conn. 209, 261, 282–83, 3 A.3d 806 (2010) (declining to adopt heightened requirements for consent searches during routine traffic stops); *State* v. *Lawrence*, supra, 282 Conn. 177 (declining to adopt heightened standard of proof for establishing voluntariness of confession); *State* v. *Piorkowski*, 243 Conn. 205, 221, 700 A.2d 1146 (1997) (declining to require presence of counsel for valid waiver of right to counsel when defendant had initiated communication with police and had properly been advised of his *Miranda* rights). As in *Purcell*, the result in the present case would be the same under either approach. The policy centered weighing process the state favors is embedded in a *Geisler* analysis as the sixth factor because "the economic and sociological considerations factor . . . is in essence a public policy analysis . . . ." *Fay* v. *Merrill*, 338 Conn. 1, 50, 256 A.3d 622 (2021).

mentalized the factors that should be considered in order to stress that a systemic analysis is required, we recognize that they may be inextricably interwoven. . . . [N]ot every *Geisler* factor is relevant in all cases. . . . Moreover, a proper *Geisler* analysis does not require us simply to tally and follow the decisions favoring one party's state constitutional claim; a deeper review of [their] underpinnings is required because we . . . follow [only] persuasive decisions. . . . The *Geisler* analysis applies to cases in which the state constitution has no federal analogue, as well as those in which the claim is that the state constitution provides greater protection than does the federal constitution." (Internal quotation marks omitted.) *State* v. *Jose A. B.*, 342 Conn. 489, 508, 270 A.3d 656 (2022).

Finding no meaningful guidance from the text or history of Connecticut's due process clause,[7] we focus our *Geisler* analysis on precedent from Connecticut and other states, federal precedent, and public policy fac-

---

[7] With respect to the text of article first, § 8, of the Connecticut constitution, it is well settled that "[t]he due process clauses of the state and the federal constitutions are virtually identical. . . . Although we have stated that this similarity neither precludes nor favors a determination that [the state constitutional provisions] impose any burden higher than the federal constitution . . . we have also concluded, in construing the due process clause in article first, § 8, of our state constitution that the similarity between the two provisions . . . support[s] a common source and, thus, a common interpretation of the provisions." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Lockhart*, 298 Conn. 537, 551–52, 4 A.3d 1176 (2010). Nevertheless, it has been well settled since *Fasulo* v. *Arafeh*, 173 Conn. 473, 378 A.2d 553 (1977), that the state due process clause "shares but is not limited by the content of its federal counterpart." Id., 475.

As for the historical circumstances surrounding the adoption of article first, § 8, of the Connecticut constitution, the defendant correctly notes that the right to counsel has deep roots in Connecticut, predating the adoption of the state constitution in 1818, and well before *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). The defendant fails, however, to establish how this history demonstrates that protecting the truth seeking function of a trial by allowing impeachment with voluntary, but *Miranda* violative statements is "clearly wrong" and not sufficiently protected by precluding their use in the state's case-in-chief.

tors. Our analysis begins with the United States Supreme Court's decision in *Harris*, in which the court held that statements obtained in violation of *Miranda*, but that are otherwise made voluntarily, may be used to impeach the credibility of a defendant who testifies at trial. *Harris* v. *New York*, supra, 401 U.S. 224–26. In arriving at this conclusion, the court reasoned that, "[t]he impeachment process . . . undoubtedly provide[s] valuable aid to the jury in assessing [the] petitioner's credibility, and the benefits of this process should not be lost . . . because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule[8] has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its [case-in-chief]." (Footnote added.) Id., 225. The court emphasized that prosecutors must be allowed to "utilize the traditional [truth testing] devices of the adversary process" because the privilege to testify in one's own defense "cannot be construed to include the right to commit perjury." Id.; see also *Oregon* v. *Hass*, 420 U.S. 714, 722–23, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975) (statement improperly obtained after police officer gave full *Miranda* warnings was properly used for impeachment because "the shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances," insofar as "inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth").

---

[8] "As a general principle, the exclusionary rule bars the government from introducing at trial evidence obtained in violation of the . . . United States constitution. . . . The rule applies to evidence that is derived from unlawful government conduct, which is commonly referred to as the fruit of the poisonous tree . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Brocuglio*, 264 Conn. 778, 786, 826 A.2d 145 (2003).

In *Reid*, this court considered federal and state constitutional claims arising from *Harris*. See *State* v. *Reid*, supra, 193 Conn. 650–56. First considering the defendant's federal constitutional claims, this court rejected his argument that the *Harris* impeachment exception was limited to only those prior inconsistent statements that would "expose 'in-court perjury' . . . ." Id., 654. This court explained that "[p]rior inconsistent statements have been considered an effective method of testing veracity. Depriving the prosecution of this [well established] tool for eliciting the truth would only marginally advance the policies of the exclusionary rule, while concurrently frustrating society's need to arrive at the truth." Id., 654–55. This court then rejected the defendant's request to "depart from the rationale of *Harris* . . . and [to] adopt an absolute exclusionary rule as a matter of state constitutional law" pursuant to article first, § 8, of the Connecticut constitution. Id., 655 n.11. This court declined to interpret the state constitution "to provide greater guarantees than its federal counterpart . . . in [that] instance," emphasizing that it found the reasoning of *Harris* "persuasive and [would] adhere to that decision."[9] (Citation omitted.) Id.

---

[9] Prior to *Reid*, this court had approved of the admission of otherwise excluded evidence for impeachment purposes on several occasions, illustrating that *Reid* did not mark a sea change with respect to this court's view of such evidence. See, e.g., *State* v. *Marino*, 190 Conn. 639, 656, 462 A.2d 1021 (1983) ("[because] the defendant did testify at his trial, if there were any inconsistencies between his testimony and his prior statements to the police, these were available for cross-examination as to his credibility regardless of whether they may have resulted from an illegal seizure"), overruled on other grounds by *State* v. *Chapman*, 229 Conn. 529, 643 A.2d 1213 (1994); *State* v. *Nardini*, 187 Conn. 513, 517–18, 447 A.2d 396 (1982) ("[s]tatements of a defendant [that] have been obtained after a failure to comply with the requirements for an effective waiver of the right to counsel or the privilege against self-incrimination may be used in cross-examining him after he has taken the witness stand at the trial").

Subsequent Connecticut decisions have echoed *Reid*. See, e.g., *State* v. *Mangual*, 311 Conn. 182, 192 n.10, 85 A.3d 627 (2014) ("*Miranda* is not a license to commit perjury, and statements obtained in violation of *Miranda*, if not the product of improper police coercion, are admissible for impeach-

The defendant contends that the United States Supreme Court's policy analysis in *Harris* and, by extension, this court's policy analysis in *Reid* were incorrect and that the impeachment exception encourages police to flout *Edwards*. Principally, the defendant relies on an article in the Connecticut Law Review and argues that it is far more likely (and less speculative) that a suspect will lie or confess falsely in a prearrest interview, given the fear and power imbalances inherent in custodial interrogation, which have a particularly strong effect on " 'members of social groups with disproportionately high conviction rates, such as young black men, [who] may despair of release and conclude they must confess to something to escape a worse fate.' "[10]

ment purposes"); *State* v. *Burge*, 195 Conn. 232, 250–51, 487 A.2d 532 (1985) ("[e]vidence may be admissible for purposes of impeachment even though it was obtained in violation of the fourth amendment [to the United States constitution] or the requirements of *Miranda*"); *State* v. *Rollins*, 20 Conn. App. 27, 34, 564 A.2d 318 ("[s]tatements of a defendant [that] have been obtained after a failure to comply with the requirements for an effective waiver of the right to counsel or the privilege against self-incrimination may be used in cross-examining him after he has taken the witness stand at the trial" (internal quotation marks omitted)), cert. denied, 213 Conn. 803, 567 A.2d 833 (1989).

[10] The defendant also cites to *State* v. *Gonzalez*, 302 Conn. 287, 25 A.3d 648 (2011), in which a police officer told a suspect that "it was his opportunity to tell his side of the story" in order to "prompt [him] to converse about the murder." Id., 299. He further relies on a 2002 law review article, in which the author catalogued cases involving wilful *Miranda* violations between 1981 and 1996. See generally E. Sanders, "Willful Violations of Miranda: Not a Speculative Possibility but an Established Fact," 4 Fla. Coastal L.J. 29 (2002). That article is not persuasive insofar as Connecticut was a subject of the survey, and the author found no instances of wilful or intentional violations of *Miranda* or *Edwards* in the state during that time period. Id., 37 n.68. At several instances during oral argument before this court, including in response to questions from the court, the defendant's appellate counsel could point to only the present case and three cases currently on the appellate docket as proof that the *Harris* rule incentivizes the police to ignore defendants' requests for counsel.

"[T]he legitimacy of prophylactic constitutional rules derives from their necessity." C. Rogers, "Putting Meat on Constitutional Bones: The Authority of State Courts To Craft Constitutional Prophylactic Rules Under the Federal Constitution," 98 B.U. L. Rev. 541, 565 (2018). There is general agreement

See D. Young, "Unnecessary Evil: Police Lying in Interrogations," 28 Conn. L. Rev. 425, 468 (1996). He also claims that we should adopt the policy balancing articulated by the Oregon Supreme Court in *State* v. *Isom*, 306 Or. 587, 761 P.2d 524 (1988), namely: "No one, including a criminal defendant, has the 'right' to give false testimony. Nor does anyone have the 'right' to commit murder or robbery. But all citizens, including criminal defendants, have constitutional rights, and the state may not prove, over objection, any crime with unconstitutionally obtained evidence." Id., 595.

Although criminal defendants possess unique constitutional rights, the defendant has not clearly established that the current policy balancing, articulated in *Harris* and *Reid*, does not adequately protect those rights by precluding the state from relying on illegally obtained evidence in its case-in-chief. This is particularly so given the prophylactic nature of the rules announced in *Miranda* and *Edwards*; see, e.g., *Michigan* v. *Harvey*, 494 U.S. 344, 350, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990); *Michigan* v. *Tucker*, 417 U.S. 433, 443–44, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974); which were intended to counteract the inherently coercive nature of custodial interrogations. See, e.g., *Miranda* v. *Arizona*, supra,

that courts should use their authority to devise prophylactic rules cautiously and to tailor them to be as narrow as possible to accomplish their purpose. See id. Courts create prophylactic rules when they determine that "the risk of a constitutional violation is sufficiently great [such] that simple case-by-case enforcement of the core right is insufficient to secure that right." B. Landsberg, "Safeguarding Constitutional Rights: The Uses and Limits of Prophylactic Rules," 66 Tenn. L. Rev. 925, 950 (1999). This court has demonstrated that it will devise and implement additional prophylactic rules, beyond those that federal law compels, when we are persuaded that they are necessary to protect the constitutional rights within our state. See, e.g., *State* v. *Purcell*, supra, 331 Conn. 361–62. The defendant has not convinced us that additional prophylaxis is necessary. In particular, the trial court found that the constitutional violation in this case was unintentional and that the statement was not coerced. On the basis of this record, we cannot conclude that the policy balance adopted in *Reid* should be overruled.

384 U.S. 457–58. Because "[t]he value of any prophylactic rule . . . must be assessed not only on the basis of what is gained, but on the basis of what is lost"; (internal quotation marks omitted) *State* v. *Francis*, 322 Conn. 247, 266, 140 A.3d 927 (2016); we agree with the United States Supreme Court that to extend the exclusionary rule from the case-in-chief to impeachment evidence would impair the truth seeking process of a criminal trial. See *Harris* v. *New York*, supra, 401 U.S. 225. The impeachment process provides a valuable aid to the jury in assessing the credibility of a defendant—or any other witness—and the jury should not be deprived of that benefit as a result of speculative claims that the possibility of obtaining impeachment evidence encourages police misconduct. When a defendant exercises his right to testify in his own defense, that choice comes with an obligation to speak truthfully and accurately, like any other witness. See, e.g., *State* v. *Vega*, 163 Conn. 304, 306–307, 306 A.2d 855 (1972); see also *State* v. *Francis*, 317 Conn. 450, 460, 118 A.3d 529 (2015) (defendant's right to testify on his own behalf "includes the right to testify fully, without perjury, to matters not precluded by a rule of evidence" (internal quotation marks omitted)); *State* v. *Perkins*, 271 Conn. 218, 244, 856 A.2d 917 (2004) (noting "tactical" nature of defendant's potentially difficult choice whether to testify and that "the truth seeking function of the criminal trial trumps").

The overwhelming weight of authority from other states aligns with Connecticut's existing view of the *Harris* impeachment exception. Beyond Alaska, Hawaii, Oregon,[11] and, to some extent, Vermont, "the impeach-

---

[11] In *State* v. *Santiago*, 53 Haw. 254, 492 P.2d 657 (1971), the Hawaii Supreme Court held that, under that state's constitution, unless proper *Miranda* warnings are given, "statements made by the accused may not be used either as direct evidence in the prosecutor's [case-in-chief] or to impeach the defendant's credibility during rebuttal or cross-examination." Id., 266. The court rejected the policy balancing articulated in *Harris*, stating that, although lying on the witness stand is undesirable, the "countervailing

ment exception is accepted in nearly every state . . . and has been found to extend to violations of constitutional rights as well as violations of *Miranda*'s prophylactic rules."[12] *State* v. *Burris*, 145 N.J. 509, 524, 679

---

value of protecting the accused's privilege to freely choose whether or not to incriminate himself . . . must be maintained, even though it necessitates that a certain number of criminals must go free in order to preserve the rights of all persons accused of crimes." Id., 267.

Similarly, in *State* v. *Isom*, supra, 306 Or. 587, the Oregon Supreme Court rejected the federal impeachment rule. See id., 589. The court distinguished failure to warn cases, such as *Harris*, from cases in which a defendant affirmatively invokes his rights, and the police "blithely" and purposely disregard that assertion and persist in questioning him. Id., 593; see id., 593–94. In failure to warn-cases, the court reasoned, "the argument that exclusion of evidence from the state's case-in-chief provides sufficient incentive for police officers to give the required information is at least plausible. *There is no incentive at all, however, coming from a rule that permits the admission for impeachment of statements obtained through interrogation after a suspect has refused to talk or has asked for a lawyer.* Once a suspect invokes the right to remain silent or the right to consult a lawyer, the police are unlikely to get anything further without counsel present unless they continue to interrogate the suspect. Under such a rule, any statements made before the invocation of rights would still be fully admissible, and any statements made thereafter would be admissible for impeachment." (Emphasis added; footnote omitted.) Id., 594.

The defendant points us to *State* v. *Batts*, 195 P.3d 144 (Alaska App. 2008), in which the Alaska Court of Appeals held that a legislative rule of evidence codifying the *Harris* impeachment exception did not violate the Alaska constitution, unless (1) the *Miranda* violations in question are intentional, or (2) "the police engage in interrogation (even in good faith) that any reasonable police officer would know violates *Miranda*." Id., 157. That holding has never been reviewed by Alaska's Supreme Court; see *Wagner* v. *State*, 347 P.3d 109, 114 n.28 (Alaska 2015); and has not been followed in any other jurisdiction. We also note that the Alaska rule would not have precluded the impeachment of the defendant in the present case, given the trial court's finding that the *Miranda* violation was not intentional.

[12] For additional case law from states that follow the *Harris* impeachment exception, see, for example, *State* v. *Swinburne*, 116 Ariz. 403, 411–12, 569 P.2d 833 (1977), *People* v. *Velarde*, 196 Colo. 254, 257–58, 586 P.2d 6 (1978), *State* v. *Durepo*, 472 A.2d 919, 922–23 (Me. 1984); *People* v. *Wilson*, 28 N.Y.3d 67, 72–73, 64 N.E.3d 286, 41 N.Y.S.3d 466 (2016), and *Riddell* v. *Rhay*, 79 Wn. 2d 248, 250, 252–53, 484 P.2d 907, cert. denied, 404 U.S. 974, 92 S. Ct. 336, 30 L. Ed. 2d 291 (1971).

Although the high courts of California and Pennsylvania initially rejected the *Harris* impeachment exception in *People* v. *Disbrow*, 16 Cal. 3d 101,

A.2d 121 (1996). We agree with the majority approach adopting the *Harris* line of cases, consistent with this court's decision in *Reid*, and do not view the policy balancing of Hawaii and Oregon as providing the most "cogent reasons and inescapable logic" necessary to overcome stare decisis. (Internal quotation marks omitted.) *State* v. *Lawrence*, supra, 282 Conn. 170.

In his concurring and dissenting opinion, Justice Ecker proposes an alternative approach to the impeachment rule. See *State* v. *Kidd*, 281 Md. 32, 49, 375 A.2d 1105, cert. denied, 434 U.S. 1002, 98 S. Ct. 646, 54 L. Ed. 2d 498 (1977); see also *State* v. *Brunelle*, 148 Vt. 347, 353, 534 A.2d 198 (1987). Under this approach, previously suppressed evidence is unavailable to the state for impeachment purposes except to challenge the defendant's "specific credibility arising from a realistic contradiction between the issues he initiated on direct examination and the impeaching statement." *State* v. *Kidd*, supra, 49. In Justice Ecker's view, this rule would have precluded the admission of the relevant parts of the defendant's statement in the present case because "[n]ot a single one" directly contradicted his testimony but, instead, were "merely inconsistent" statements. We disagree with this approach. We have long recognized that inconsistencies provide juries with a method for

113, 545 P.2d 272, 127 Cal Rptr. 360 (1976), and *Commonwealth* v. *Triplett*, 462 Pa. 244, 248–49, 341 A.2d 62 (1975) (plurality opinion), respectively, the voters of both states thereafter adopted constitutional amendments that abrogated those decisions. See *People* v. *May*, 44 Cal. 3d 309, 318, 748 P.2d 307, 243 Cal. Rptr. 369 (1988) (explaining that California voters' adoption of constitutional amendment "to dispense with exclusionary rules derived solely from the state [c]onstitution" rendered it "not reasonably likely that [they] intended to preserve, in the form of a statutory privilege, a judicially created exclusionary rule expressly rejected by the United States Supreme Court under the federal constitution" (emphasis omitted; internal quotation marks omitted)); *Commonwealth* v. *Molina*, 628 Pa. 465, 495, 104 A.3d 430 (2014) (concluding that amendment to Pennsylvania constitution in response to *Triplett* "protects [the] adversary system by allowing the [c]ommonwealth to challenge the defendant's testimony with prior inconsistent statements").

testing the reliability of the testimony of any witness, including a defendant. See, e.g., *State* v. *Richardson*, 214 Conn. 752, 763–64, 574 A.2d 182 (1990); see also *Grunewald* v. *United States*, 353 U.S. 391, 418, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957) (impeachment by prior inconsistent statement is "an elementary rule of evidence"). This approach departs from the black letter principle that "[i]nconsistencies may be shown not only by contradictory statements but also by omissions." *State* v. *Whelan*, 200 Conn. 743, 748 n.4, 513 A.2d 86, 91, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). "Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in changes in position and they may also be found in denial of recollection." (Citation omitted; internal quotation marks omitted.) Id., 748–49 n.4; see id., 749 n.4 (noting "evasive answers" may also furnish basis for inconsistency). Justice Ecker's approach would require an evaluation of the level of contradiction presented by each individual piece of evidence and does not accord with the well established principle that, "[i]n determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined." Id., 748 n.4.

Instead, we find persuasive the decision of the New York Court of Appeals in *People* v. *Wise*, 46 N.Y.2d 321, 385 N.E.2d 1262, 413 N.Y.S.2d 334 (1978), in which, after adopting the policy principles of both *Harris* and *Oregon* v. *Hass*, supra, 420 U.S. 714, the court rejected an approach similar to that proposed by Justice Ecker. See *People* v. *Wise*, supra, 327–29. The court applied "seasoned impeachment principles"; id., 327; and

"familiar rules of evidence"; id., 328; to hold that such statements need not directly contradict the defendant's testimony. See id., 329; see also id., 326 ("a more rigorous rule requiring direct contradiction would be at odds with the purpose underlying use of prior inconsistents, since such statements are admitted principally to assist the jury in its fact-finding role"); id., 327–28 ("[s]imply put, [when] a defendant's trial testimony offers one version of the events in question, and his prior remark to a police officer suggests a contrary view of those events, the jury is entitled to hear the previous statement so that it may fully assess the witness' credibility").

Guided by *Geisler*, as well as stare decisis considerations, we conclude that the defendant, who challenges *Reid*'s continuing vitality, has not established inescapable reasons that would compel us to overrule *Reid*'s holding that excluding illegally obtained evidence from the state's case-in-chief provides a sufficient deterrent effect to vindicate the prophylactic rules of *Miranda* and *Edwards*. See *State* v. *Henderson*, supra, 348 Conn. 657. We are not persuaded that the current remedy of exclusion from the state's case-in-chief is clearly wrong, particularly in cases such as the present one, in which the *Miranda* violation was unintentional and the statement was otherwise voluntary in nature. We also view the approach espoused by Justice Ecker as inconsistent with the truth seeking function of cross-examination and, similarly, not sufficiently compelling to justify a departure from *Reid*. Because we continue to follow the *Harris* impeachment exception under article first, § 8, of the Connecticut constitution, we conclude that the trial court correctly limited the remedy for the *Miranda* violation to precluding the prosecution from using the defendant's statement in its case-in-chief.[13]

---

[13] The trial court in the present case provided the proper limiting instruction to the jury regarding the use of this impeachment evidence to mitigate any prejudice that may occur. We presume, without evidence to the contrary,

## II

We next address the defendant's claim that the trial court improperly admitted photographs that the Waterbury police had taken of the defendant during his interview with them. The defendant argues that his rights were violated under the fifth amendment to the United States constitution because *United States* v. *Patane*, 542 U.S. 630, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004), which allows physical fruits of an illegally obtained statement to be entered into evidence; id., 634 (opinion announcing judgment); applies only when officers fail to provide *Miranda* warnings, and not in the *Edwards* situation, in which warnings have been given but a request for an attorney has been ignored. Alternatively, the defendant argues that the photographs were inadmissible under article first, § 8, of the Connecticut constitution. We disagree with the defendant on both grounds.

The record reveals the following additional relevant facts. On the third day of evidence, the trial court heard arguments, outside the presence of the jury, regarding the prosecutor's intention to call Howles to testify about photographs he had taken of the defendant during the interview that resulted in the suppressed statement. Defense counsel objected and argued that the photographs were the fruit of the poisonous tree because the statement had been suppressed. The prosecutor then withdrew two of the six photographs he had originally planned to enter into evidence through Howles but renewed the request with respect to the remaining four, indicating that it would "put an offer of proof" through Howles.

After hearing that offer of proof,[14] the trial court overruled defense counsel's objection, reasoning that, even

that a jury follows a trial court's instructions. See, e.g., *State* v. *Griggs*, 288 Conn. 116, 142, 951 A.2d 531 (2008).

[14] During the offer of proof, Howles testified that, when a person is arrested, he checks them for injuries and documents what he finds "for any

if the photographs were obtained as a result of the illegally obtained statement, "they are physical fruits of a *Miranda* violation, which [are] not suppressible under our law," and, "alternatively, even if they could be suppressed under that argument, [the court] credit[s] [Howles'] statement that they would have been taken in any event."

The jury returned, and Howles testified that, as part of his investigative duties, he looks for and documents injuries or lack of injuries to suspects and arrestees, and he followed that process when he met the defendant at the police station in the Bronx. The trial court subsequently admitted the four photographs into evidence. Thereafter, the prosecutor utilized these photographs during cross-examination and during his closing argument to challenge the credibility of the defendant's account of the altercation and to argue that no reasonable person in the defendant's position, with such minor injuries, would have reacted to the victim in the violent manner that he did. Defense counsel did not object to any portion of the prosecutor's closing argument.

On appeal, the defendant argues that the trial court violated his fifth amendment rights when it admitted the photographs taken during the interview with the Waterbury police and that the rule established in *Patane* does not apply to this case. The defendant claims that *Patane*'s holding is limited to "failure to warn" cases and that, whether the physical fruits of statements

evidentiary value, especially [when] . . . a crime of [a] violent nature [is involved]." He further explained that, even if the defendant had not given a statement, as part of the routine procedures, he would have looked for injuries and documented anything that he found. Howles acknowledged that two close-up photographs of the defendant's forehead and ear were not taken as part of the arrest procedure. The state informed the court that it would not be offering those two photographs into evidence. As for the other four photographs, which depicted the defendant's face, forearms, and finger, Howles testified that he would have taken those photographs, regardless of whether the defendant had spoken to him.

obtained in violation of *Edwards* may be admitted, remains an open question of law. We conclude that the photographs were not physical "fruits" of the illegally obtained statement and, therefore, do not reach the defendant's claim under *Patane*.

Under the independent source doctrine, evidence obtained for reasons unrelated to unlawful police conduct is not a fruit of such conduct. See, e.g., *Nix* v. *Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). It is well established that "the interest of society in deterring unlawful police conduct and the public interest in having [fact finders] receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred." (Emphasis in original; internal quotation marks omitted.) *State* v. *Vivo*, 241 Conn. 665, 672, 697 A.2d 1130 (1997), quoting *Nix* v. *Williams*, supra, 443. To determine whether a lawful means for obtaining evidence was independent from unlawful police activity, a court "must ask whether [the evidence] would have been sought even if [the tainted activity that] actually happened had not occurred . . . ." (Internal quotation marks omitted.) *State* v. *Vivo*, supra, 677, quoting *Murray* v. *United States*, 487 U.S. 533, 542 n.3, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988); see also *State* v. *Correa*, 340 Conn. 619, 668, 264 A.3d 894 (2021). Routine photographs of criminal defendants taken in connection with arrests are a lawful procedure, even when a *Miranda* violation has occurred, "because a photograph is not a confession or other evidence of a testimonial nature." *State* v. *Hackett*, 182 Conn. 511, 516, 438 A.2d 276 (1980). Moreover, the state did not offer two photographs that derived from the defendant's illegally obtained statement. The remaining four photographs that were admitted into evidence had an inde-

pendent source in a lawful photographing protocol and, therefore, were admissible.

In the present case, the trial court credited Howles' testimony that he ordinarily takes photographs of suspects involved in violent crimes to show both the presence of injuries and the lack thereof, and that, in this case, he acted in accordance with his standard procedure and would have done so regardless of whether the defendant had given a statement. We defer to that credibility determination. See, e.g., *State* v. *Castillo*, 329 Conn. 311, 322, 186 A.3d 672 (2018). Because the photographs had an independent source in the police procedure of photographing arrestees, they were not fruits of the illegally obtained statement, thereby requiring analysis under *Patane*.

Alternatively, the defendant argues that the photographs were inadmissible under article first, § 8, of the Connecticut constitution, and asks this court to hold that our constitution requires suppression of physical evidence derived from an illegally obtained statement as "fruit of the poisonous tree." Because the defense objected to the admission of this evidence on federal, and not state, constitutional grounds, he asks for review of this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). We need not decide this state constitutional issue, however, because it is resolved by our conclusion that the photographs had an independent, untainted source in standard police protocol, as established through Howles' testimony, which the trial court credited. See, e.g., *State* v. *McCahill*, 261 Conn. 492, 501, 811 A.2d 667 (2002) (this court does "not engage in addressing constitutional questions unless their resolution is unavoidable").

Accordingly, we conclude that the admission of the four photographs did not violate the defendant's rights under the state or federal constitutions.

### III

Finally, the defendant claims that the trial court improperly allowed the prosecution to call a witness it had not disclosed until three days prior to the start of evidence, thereby depriving him of a fair trial. We disagree.

The following additional facts are relevant to this claim. When the trial court granted in part the defendant's motion to suppress his statement to the Waterbury police, the prosecutor requested a six week continuance. The prosecutor had argued that the defendant's motion was untimely because it was not filed within ten days after the first pretrial conference, as required by Practice Book § 41-5; in this case, that conference had taken place years earlier. The prosecutor explained that the suppression of the statement had rendered it necessary to call and prepare additional witnesses. When asked why he had not raised this issue when the court indicated that it would hear the matter at the end of jury selection, the prosecutor responded: "Candidly? Nobody thought it would be granted." The court commented, "[t]hat's your mistake," and denied the request for a six week continuance.

Prior to the start of evidence, the trial court heard arguments on the defendant's motion to preclude testimony from a late disclosed witness, the victim's sister-in-law, K. In his motion, the defendant argued that K's name had not appeared in any prior exchange of discovery and that the defense had no contact information or criminal history for her, and, thus, was unable to prepare for cross-examination with such short notice. The prosecutor explained that K possessed Facebook messages that the defendant had sent to her right before

his arrest, in which he admitted to killing the victim, and that, although the prosecutor knew of this information, as K had spoken to the victim's advocate in 2018, he had not initially planned to call her as a witness because she was residing in North Carolina. Immediately after the defendant's motion to suppress was granted, the prosecutor contacted K, obtained screenshots of the messages, and shared them with the defense. The prosecutor also informed the defense that K had no pending criminal charges and a 1993 conviction. At the time of that hearing, K was out of the country but would return in time to testify at trial; the prosecutor provided her phone number and made her available to the defense.

In ruling on the motion to preclude, the trial court considered "whether there [was] good cause for the delay, the extent of prejudice to the defendant, and the feasibility of other remedies." The court found that the prosecutor had good cause in adding the witness late because the defendant had filed his motion to suppress "well beyond the presumptive deadline of ten days after the first pretrial conference, which took place . . . in 2019," resulting in short notice to the prosecutor of the need for additional testimony of the defendant's admitting to the killing. The court also found that any prejudice to the defendant was de minimis because the defendant knew he had confessed to K via Facebook Messenger from the outset of the case. Finally, the court determined that a continuance was not feasible because the jury had already been selected. Accordingly, the court denied the motion.

"[T]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the state for its allegedly improper conduct. As we have indicated, the formulation of an appropriate sanction is a matter within the sound discretion of the trial court. . . . In

determining what sanction is appropriate for failure to comply with court ordered discovery, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." (Internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 186, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001). Further, Practice Book § 40-13 (c) provides: "No witness shall be precluded from testifying for any party because his or her name or statement or criminal history was not disclosed pursuant to this rule if the party calling such witness did not in good faith intend to call the witness at the time that he or she provided the material required by this rule. In the interests of justice the judicial authority may in its discretion permit any undisclosed individual to testify."

We conclude that the trial court did not abuse its discretion by allowing the prosecutor to call K to testify. The record supports the fact that the prosecutor did not believe that he needed K's testimony when preparing his initial witness list. K lived out of state, and the prosecution planned to offer the defendant's statement, which the court suppressed right before trial. The court adequately considered the *Respass* factors when ruling on the defendant's motion to preclude K from testifying.

More important, as the primary purpose of a sanction for violation of a discovery order is the protection of the defendant's rights, the defendant has not demonstrated any prejudice from the delay in disclosure of K's testimony. The record does not establish that the defense was unable to prepare for K's testimony. When asked by the trial court what prejudice would result, defense counsel identified none and acknowledged that there was less harm from K's testimony than from a late disclosed expert witness. The defendant's only asser-

tion is that the content of K's testimony was damaging to his case, which is irrelevant to the inquiry because that is not a function of delay. Because Practice Book § 40-13 (c) embraces a presumption against precluding a witness' testimony as a sanction for a delayed disclosure, and because the defendant has made no showing of any prejudice from the delayed disclosure, the trial court did not abuse its discretion in permitting K's testimony or violate the defendant's right to a fair trial.

The judgment is affirmed.

In this opinion MULLINS, C. J., and McDONALD, D'AURIA and DANNEHY, Js., concurred, and, as to parts II and III, ECKER, J., concurred.